UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CINDY ADAMS<br>Individually and on behalf of others similarly situated,<br>    *Plaintiff*,<br><br>v.<br><br>LIBERTY BANK and DOES 1 through 5<br>*Defendants*. | No. 3:20-cv-01601(MPS) |

## RULING ON MOTION TO DISMISS

Plaintiff Cindy Adams brings this class action against Liberty Bank and Does 1 through 5 alleging injuries stemming from Liberty's overdraft fees and policies. She sets out two counts in her complaint: (1) Liberty's overdraft opt-in notice did not satisfy the requirements of Regulation E of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §1693 and 12 C.F.R. § 1005 *et seq*., making the overdraft fees Liberty assessed illegal, and (ii) Liberty's charging of fees without giving her and class members a notice that complied with Regulation E violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq*. She seeks damages, costs, injunctive relief, and attorneys' fees. Defendant moves to dismiss both counts under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (ECF No. 20 at 1). For the following reasons, Defendant's motion is DENIED.

**I.  FACTUAL BACKGROUND**

The Plaintiff makes the following factual allegations in her complaint, which I assume to be true for the purposes of this ruling.

Cindy Adams is a resident of Connecticut and has been Liberty's customer since February 2020. (ECF No. 1 at ¶ 26). Liberty Bank is headquartered in Connecticut. (*Id.* at ¶ 9).

Does 1 through 5 are "agents, partners, joint ventures," or affiliates of Liberty, "own and/or operate" its branches, and have a unity of ownership and interest with each other and Liberty. (*Id*. at ¶¶ 10-12).

Since 2009, Regulation E has required financial institutions to obtain consumers' affirmative consent via a segregated opt-in notice or "agreement" before they charge overdraft fees on ATM withdrawals or one-time, "point-of-sale" ("POS") debit card purchases. (*Id*. at ¶¶ 32-37). Absent such consent, the financial institution may either cover the overdraft without charging a fee or direct that the transaction be denied at the point of sale. (*Id*. at ¶ 33.) An overdraft "occurs when two conditions are satisfied. First, the accountholder initiates a transaction that will result in the money in the account falling below zero if the financial institution makes payment on the transaction. Second, the financial institution then agrees to advance its own funds to cover the shortfall." (*Id.* at ¶ 30). Financial institutions calculate whether an account balance falls below zero by using either the "actual" balance—that is the money in the account at that very moment—or the "available" balance, which subtracts from the actual balance any money the financial institution "has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment." (*Id.* at ¶¶ 39-43).

Liberty's opt-in agreement explains that "an overdraft 'occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway,'" without reference to whether the bank uses the "available" or "actual" balance calculation. (*Id.* at ¶ 50). Liberty uses the "available" balance, rather than the actual balance, to determine when to charge an overdraft fee. (*Id.* at ¶ 54). This means that Liberty charges overdraft fees even at times when there is a sufficient amount of money in a consumer's account and Liberty does not have to

advance any funds. (*Id.* at ¶ 83). Adams alleges that Liberty maintained this practice knowing EFTA's requirements and that its opt-in agreement did not provide an accurate, clear, and easily understandable definition of an overdraft. (*Id*. at ¶¶ 50-56).

When she opened her account, Adams "opted into Liberty's overdraft program for debit card and ATM transactions." (*Id.* at ¶ 26). She and other putative class members were charged overdraft fees on an "available" balance policy at various times, "even though Liberty's opt-in disclosure agreement explains that an overdraft only occurs 'when you do not have enough money in the account to cover the transaction,' a description of the 'actual' balance of an account." (*Id.* at ¶¶ 26, 66). This allegedly illegal assessment of fees harmed Adams and the putative class. (*Id.* at ¶ 84). Adams alleges that a reasonable consumer could find Liberty's opt-in agreement unclear, ambiguous, and/or inaccurate, falling short of EFTA's requirements. (*Id.* at ¶¶ 1, 4-7, 49, 51). This also makes the opt-in agreement "materially false and/or misleading" and amounts to a CUTPA violation. (*Id.* at ¶ 94). Plaintiff filed this action October 23, 2020 (*Id*. at 1). Defendant moved to dismiss on January 25, 2021 (ECf No. 20). Both parties have briefed the issues and notified the Court of new authorities from other courts. (ECF Nos. 20, 25, 31, 35-38).

## II.   LEGAL STANDARD

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must draw "all reasonable inferences in favor of the non-moving party,"

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims. . ." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004). "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This includes materials expressly incorporated into the complaint and documents not incorporated but "integral" to the complaint in the sense that it relies heavily on them. *Id.*

### III. DISCUSSION

Liberty argues that Adams fails to state a claim because (1) when the opt-in agreement is considered together with other documents provided to Adams when she opened her account, it clearly explains that overdraft fees would be charged when the "available balance" fell below zero; (2) in any event, Liberty is shielded from liability under the safe harbor provisions of the EFTA, because the language of the opt-in agreement is virtually identical to a model form promulgated by the Consumer Financial Protection Bureau ("CFPB"), the agency currently charged with administering the EFTA[1]; and (3) Adams's CUTPA claim fails because it amounts to nothing more than a breach-of-contract claim and Liberty did not engage in any deceptive or unfair practice. For the reasons set forth below, I do not find any of these arguments convincing and conclude that Adams has pled plausible claims under the EFTA and CUTPA.

### A. EFTA

---

[1] Congress reassigned responsibility for enforcing the EFTA from the Federal Reserve Board to the CFPB in 2010. Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, Title X, § 1084, 124 Stat. 1376, 2081–83.

### i. Regulation E Violation

The EFTA authorized the Federal Reserve Board, and now authorizes the CFPB (*see* note 1, *supra*), to prescribe rules to carry out its purposes, 15 U.S.C. 1693b(a), which are "the provision of individual consumer rights" and the provision of "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b).  Under this authority, the Federal Reserve Board promulgated Regulation E, which permits financial institutions to charge overdraft fees only if they obtain affirmative consent, i.e., an agreement to "opt in," from consumers.  12 C.F.R. § 1005.17(b)(1). Specifically, financial institutions must provide the consumer with a "notice in writing, . . . segregated from all other information, describing the institution's overdraft service," § 1005.17(b)(1)(i), i.e., "[the] service under which [the] financial institution assesses a fee or charge on a consumer's account held by the institution for paying a transaction (including a check or other item) when the consumer has insufficient or unavailable funds in the account." § 1005.17(a).  The notice must be "clear and readily understandable." § 1005.4.  The institution must give the consumer a reasonable opportunity to consent; it must obtain that consent; and it must provide the consumer with written confirmation of her consent.  §§ 1005.17(b)(1)(ii-iv).  In addition, among other things, the notice must be "substantially similar to Model Form A-9," promulgated by the CFPB, § 1005.17(d), must include a brief description of the institution's overdraft service, must identify the amount of any overdraft fees, and must include an explanation of the consumer's right affirmatively to consent to the institution's payment of overdrafts.  *Id.*  Courts have found that the EFTA provides a cause of action for violation of regulations issued thereunder, including Regulation E.  *See, e.g., Lussoro v. Ocean Fin. Fed.*

*Credit Union*, 456 F. Supp.3d 474, 494 (E.D.N.Y. 2020); *Wellington v. Empower Fed. Credit Union*, 2021 WL 1377789 *4 (N.D.N.Y. Apr. 13, 2021).

Liberty argues that it complied with Regulation E, because the opt-in notice it used, when read together with an "Account Agreement" and "Overdraft Disclosure" it says were provided to Adams when she opened her account, made clear that it would charge overdraft fees when her "available balance" fell below zero. There are two problems with this argument. First, it relies on documents, i.e., the "Account Agreement" and "Overdraft Disclosure," that are not attached to, incorporated in, or otherwise "integral" to the complaint and are thus not materials I may consider in deciding a motion to dismiss. Second, it runs counter to Regulation E, which requires that the notice itself, as a "segregated" document, set forth a description of Liberty's "overdraft service" in "clear and readily understandable" language; a faulty notice is not saved by clarifying language in other documents. I expand on these two points below.

Liberty asks the Court to consider materials attached to its motion that, according to a declaration by a Liberty Vice President, were either signed by Adams when she opened her account or were provided to her if the branch at which she opened the account followed Liberty's ordinary practice. ECF No. 20-2 at 2. These materials include (1) a signature card (apparently signed by Adams), (2) an unsigned, 24-page "Personal Deposit Account Agreement," (3) a document entitled "Important Information About Overdraft and Overdraft Fees," and (4) a brochure entitled "Handy Tips." *Id.* at 4-38.

As noted above, in deciding a motion to dismiss, I may consider only the allegations of the complaint, materials expressly incorporated into the complaint, and documents not incorporated in but "integral" to the complaint. The Second Circuit has held that "[a] document is integral to the complaint where the complaint relies heavily upon its terms and effect," and

6

that "[m]erely mentioning a document in the complaint" or "even offering limited quotations from the document" "will not satisfy this standard." *Goel*, 820 F.3d at 559 (internal quotation marks omitted). "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which plaintiff's complaint stands or falls, but which for some reason – usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim – was not attached to the complaint." *Id.* (internal quotation marks omitted).

The third document listed above, I may and will consider because it is the opt-in notice (or agreement) described in the complaint and the complaint "relies heavily on its terms and effect." As the complaint alleges, ECF No. 1 ¶¶ 1, 49, it is labeled "Important Information About Overdraft Fees," and it opens with the same sentence the complaint alleges is misleading: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." ECF No. 20-2 at 32; ECF No. 1 ¶¶ 26, 50-51. But the complaint makes no reference to the other three documents and does not rely on "their terms or effect."[2] Nor does the complaint "stand[] or fall[]" on the obligations set forth in those documents. Contrary to the defendant's argument, the complaint does not allege a "breach of contract" claim, ECF No. 20-1 at 7, and the plaintiff specifically disavows any such claim. ECF No. 25 at 9. The complaint thus does not "stand or fall" on the "Account Agreement" or the

---

[2] The complaint describes the opt-in notice as "the opt-in disclosure agreement," but it makes clear that this reference is limited to the notice and does not encompass any other documents or agreements. ECF No. 1 at ¶ 1 ("Liberty intentionally captions the Reg E opt-in disclosure agreement as 'Important Information about Overdrafts and Fees,' but provides ambiguous and inaccurate language in the opt-in disclosure agreement to describe under what circumstances a customer is subject to an overdraft fee.") And contrary to Liberty's arguments (ECF No. 20-1 at 14-15), the opt-in notice itself does not refer to or incorporate by reference the other documents attached to Liberty's motion. See ECF No. 20-2 at 32-33. Further, although the opt-in notice refers to "standard overdraft practices," it goes on to explain "[w]hat … the standard overdraft practices that come with my account" are (ECF No. 20-2 at 32) – leaving it, at best, unclear whether they are further explained elsewhere.

other two documents Liberty attaches to its motion.  Finally, as Adams notes, to consider these documents, I would need to credit the statements in Liberty's declaration suggesting that Adams actually received them, a point Adams does not concede.  (ECF No. 25 at 18.)  I therefore may not rely on the Account Agreement, the signature card, or the "Handy Tips" document in deciding this motion.  *See Wellington v. Empower Fed. Credit Union*, 2021 WL 1377789 *3 (N.D.N.Y. Apr. 13, 2021)(in assessing motion to dismiss similar Regulation E claim, finding it improper to consider credit union membership application and membership agreement, both because they were not mentioned in the complaint and because there was a dispute over the authenticity or accuracy of the documents).

      Even if I could consider these documents, however, they would not make Adams's claim of a Regulation E violation any less plausible.  Regulation E itself requires financial institutions to make the specified disclosures about their overdraft program in a "notice in writing, . . . *segregated from all other information*," 12 C.F.R. § 1005.17(b)(1)(i)(emphasis added), i.e., in a stand-alone document.  So even if further information in the Account Agreement or the other documents on which Liberty relies would, when read together with the opt-in notice, provide the content specified in Regulation E, that would not satisfy the Regulation.  *See, e.g., Ramirez v. Baxter Credit Union*, 2017 WL 118859 *8 (N.D. Cal. Jan. 12, 2017)(in case where court considered account agreement and other documents in assessing breach of contract claim, it refused to do so in assessing Regulation E claim: "[I]n this instance, the Court will not construe the opt-in form in conjunction with the Deposit Account Agreement" because "Regulation E specifically governs the requirements of the opt-in form on its own, and plaintiff has properly alleged that [the credit union's] opt-in form is facially deficient.").  Under Regulation E, the opt-in notice must pass muster on its own.

And the complaint plausibly alleges that it does not. Liberty's Opt-In Agreement states that an overdraft occurs "when you do not have enough money in your account to cover a transaction, but we pay it anyway." This language is far from unambiguous – or "clear and readily understandable," 12 C.F.R. § 1005.4 – because it does not clearly convey that Liberty will charge overdraft fees when a transaction would cause an "available" balance overdraft but not an "actual" balance overdraft. Indeed, the very existence of different methods for calculating the balance in an account demonstrates that the phrase "enough money in your account to cover a transaction" is ambiguous; before one can grasp the precise meaning of that phrase, one must know which balance calculation method the financial institution is using, because, according to Adams's allegations, there will be some occasions when the account has "enough" under the actual balance method but not under the available balance method. (ECF No. 1 at paras. 43-44.) The phrase "we pay it anyway" only compounds the ambiguity: It is reasonable to read that phrase to convey that the bank in any overdraft situation is paying for the transaction from its own funds, especially because it follows the clause, "[w]hen you do not have enough money in your account." But according to Adams, that is not what is happening, at least not all the time; she alleges that in transactions where use of the "available balance" method results in an overdraft but use of the "actual balance" method would not, the bank pays the transaction with the consumer's funds, not its own. (*Id.*) The opt-in notice does not say anything about which balance-calculation method Liberty uses – it nowhere mentions either "actual balance" or "available balance," ECF No. 20-2 at 32-33 – and so the consumer is left without enough information to understand all the situations in which overdraft fees will be charged in ATM and one-time debit card transactions. In short, the claim that the notice does not provide a "clear and readily understandable" description of Liberty's overdraft policies is plausible.

9

Liberty points out, correctly, that it plucked the phrase, "when you do not have enough money in your account to cover a transaction, but we pay it anyway" straight from the CFPB's Model Form A-9.  But using language "substantially similar" to Model Form A-9 is only one of the requirements of Regulation E, 12 C.F.R. § 1005.17(d), and cannot excuse non-compliance with the other requirements, including the requirement that the disclosure be "clear and readily understandable." Liberty contends that because the CFPB designed the Model Form to cover both "actual" and "available" balance schemes, Liberty's disclosure using the Model Form's language was clear.  But courts routinely hold that the language of Model Form A-9 – "an overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway" – does not adequately describe the bank's overdraft fees when they use the "available" balance method.  *Walker*, 305 F. Supp. 3d at 376; *Wellington v. Empower Fed. Credit Union*, No. 20CV1367 (DNH), 2021 WL 1377789 at *4 (N.D.N.Y. Apr. 13, 2021); *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1243-44 (11th Cir. 2019).  Some banks, including some that use the "available" balance method, adjust the Model Form to reflect more clearly their own overdraft policies.  *See, e.g., Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 15-16 (D.D.C. 2016)(describing credit union's addition of language to model form that provided examples that "explicitly ma[d]e overdrafts a function of the customer's available balance.")

For these reasons, I find that Adams has alleged a plausible Regulation E violation.[3]

---

[3] In a footnote, Liberty challenges Adams's standing, arguing that because the other documents attached to its motion made clear that it was using an "available balance" method, Adams's claim is just that the explanation should have been contained in a single document and thus amounts to a mere "technical violation of Regulation E that did not cause her any concrete harm." (ECF No. 31 at 10 n.8). Even accepting for purposes of argument that the other documents made everything crystal clear, I do not find Liberty's standing challenge persuasive.  When reasonable inferences are drawn in her favor, Adams's allegations plausibly suggest that Liberty's failure clearly to explain its overdraft policy in the opt-in notice led to her being charged an overdraft fee on a one-time credit card transaction on March 16, 2020. (ECF No. 1 at para. 26.)  Perhaps she did not receive the other documents or look at them; only further factual development will tell us.  In any event, her allegations of being charged an overdraft fee

### ii.     Safe Harbor Provisions

Liberty also argues that Adams's Regulation E claim is foreclosed by two "safe harbor" provisions in the EFTA, which protect financial institutions that satisfy their requirements from liability. Liberty argues that its use of the Model A-9 form satisfies both of the safe harbors, which provide as follows:

> No provision of this section or section 1693n of this title imposing any liability shall apply to--
> (1) any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Bureau or the Board or in conformity with any interpretation or approval by an official or employee of the Bureau of Consumer Financial Protection or the Federal Reserve System duly authorized by the Bureau or the Board to issue such interpretations or approvals under such procedures as the Bureau or the Board may prescribe therefor; or
> (2) any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board

15 U.S.C. § 1693m(d). The first, "good faith" provision does not apply for two reasons. First, Adams has alleged that Liberty knowingly used a misleading opt-in notice and then charged overdraft fees. (ECF No. 1 at ¶¶ 58-63). That allegation and the inferences reasonably drawn from it are enough to disqualify Liberty from using the "good faith" provision. Second, the only "rule, regulation, or interpretation thereof" that Liberty identifies as the basis for invoking

---

after being provided an unclear notice about such fees are plainly enough for the "concrete harm" that standing jurisprudence demands. *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016)("To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical"; "[a] concrete injury must … actually exist," i.e., it must be "real, and not abstract" (internal quotation marks omitted). The incurring of an overdraft fee is plainly a "real" injury. But even if Adams had not been charged an overdraft fee, she would likely still have had standing in this case. The Supreme Court has suggested that even the "risk of real harm" can satisfy the requirement of concreteness, *id.* at 1549, and the allegedly unclear opt-in notice increased the risk of unexpected or unneeded overdraft fees, one of the harms regulators identified in promulgating Regulation E. 74 Fed. Reg. 59033-35; *see also Spokeo*, 136 S.Ct. at 1549 ("plaintiff in such a case need not allege any additional harm beyond the one Congress has identified").

Section 1693m(d)(1) is Model Form A-9, (ECF No. 20-1 at 21), which is also the basis for its invocation of Section 1693m(d)(2), which, as discussed below, specifically refers to "model clause[s]." Model Form A-9 and the other model clauses promulgated by the CFPB are not "rules" or "regulations," and calling them "interpretations" of rules or regulations or "approvals" by agency staff would make Section 1693m(d)(2) – which specifically immunizes financial institutions that rely on "appropriate model clause[s]" – superfluous. Liberty's interpretation of Section 1693m(d)(1) would thus violate a basic principle of statutory construction. *TRW Inc., v. Andrews*, 534 U.S. 19, 31 (2001)("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).

Courts have struggled to interpret the second safe harbor provision in a way that makes sense of the statute as a whole. Statutory construction begins with "the plain language" and culminates in an "attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Fed. Housing Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 141 (2d Cir. 2013)(internal quotation marks omitted). Only if the text is ambiguous does the Court consider legislative history and other tools. *Id*. The second safe harbor provides protection from liability over a certain class of claims—those about "failure[s] to make disclosure in proper form"—if a bank does a certain action—"utiliz[e] an appropriate model clause issued by the Bureau or the Board." 15 U.S.C. § 1693m(d)(2). Adams does not dispute that Model Form A-9 and, in particular, the phrase "when you do not have enough money in your account to cover a transaction, but we pay it anyway," is a "model clause issued by the Bureau or the Board."

12

Adams argues that her Regulation E claim in this case does not allege a "failure to make disclosure in proper form," but attacks instead the substance or content of the disclosure. ECF No. 25 at 20. Some courts have found this argument convincing, based on the distinction between "form" and "substance" or "form" and "content," *see, e.g., Tims v. LGE Community Credit Union*, 935 F.3d 1228, 1244 (11th Cir. 2019)(finding safe harbor inapplicable to plaintiff's claim that credit union's Model Form A-9 language violated Regulation E because "making disclosure in proper form means making the disclosure according to proper procedures" and "[t]he safe-harbor provision insulates financial institutions from EFTA claims based on the *means* by which the institution has communicated its overdraft policy" (emphasis in original)); but I do not agree with their reasoning. In the context of the statute, the best reading of the word "form" means the content of the disclosure. Black's Law Dictionary explains that "form" can mean, among other things, "the customary method of drafting legal documents, usu[ally] with fixed words, phrases, and sentences." *Black's Law Dictionary* (11th ed. 2019). This reading fits the context better than any of the other "many meanings" of "form," *Tims*, 935 F.3d at 1244, because the safe harbor provision uses "form" and "model clause" in the same sentence, and a model clause is one with "fixed words, phrases, and sentences." *See Black's Law Dictionary* (11th ed. 2019) (defining "clause" as "a distinct section or provision of a legal document or instrument"); *see also OED Online* (August 2021)(defining "clause" as, among other things, "a particular and separate article, stipulation, or proviso, in any formal or legal document"). The most natural reading of § 1693m(d)(2) is thus that it protects a bank from claims arising out of a failure to use particular "words, phrases, and sentences" in a disclosure, i.e., from claims about a disclosure's inadequate content, if the bank "utilized an appropriate model" clause "issued by the Bureau or the Board."

This reading also makes better sense of the statute as a whole than the alternative reading offered by Adams and the court in *Tims*, i.e., the one that construes "form" as the procedures of disclosure. In the context of Regulation E's overdraft provisions, the *Tims* interpretation would relegate § 1693m(d)(2) immunity to a narrow set of claims having nothing to do with the "Form A-9" that was the basis for the immunity, i.e., claims that financial institutions failed to follow the procedures set out in 12 C.F.R. §§ 1005.17(b)(1)(i-iv). *Tims*, 935 F.3d at 1245. For example, simply because they used a model form, financial institutions would be shielded from claims that they failed to provide the consumer the notice in writing, failed to provide a writing "segregated" from other information, failed to provide the consumer a reasonable opportunity to "affirmatively consent", failed to "obtain[] the consumer's affirmative consent, and failed to "provide[] the consumer with confirmation of the consumer's consent in writing." § 1005.17(b)(1). Under the *Tims* reading of "form," consumers could not sue financial institutions that used Form A-9 for failures to comply with these "procedural" requirements, even though these requirements are unrelated to Form A-9. I conclude, therefore, that, in this particular context, "form" means the content of the disclosure.

That is not the end of the story, however, because the second safe harbor provision requires more than just use of a model clause; the financial institution must use an "*appropriate* model clause." 15 U.S.C. § 1693m(d)(2). Appropriate means "specially fitted or suitable." *OED Online* (June 2021). The safe harbor provision thus requires that the model clause selected be "suitable" for "describing the institution's overdraft service" in a "clear and readily understandable manner." 12 C.F.R. §§ 1005.17(b)(i), 1005.4(a)(1). Not all model clauses are "suitable" for each institution and its policies; if they were, then use of any model clause, by itself, would confer immunity from suit. And if that were the law, several of the provisions of

14

Regulation E would be a dead letter. As noted above, the regulation requires not only that "the notice …. be substantially similar to Model Form A-9" but also that it contain the specific content identified in Section 1005.17(d), including, among others, "[a] brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge … may be imposed," "[t]he dollar amount of any [overdraft] fees or charges," "[t]he maximum number of overdraft fees or charges that may be assessed per day," and "[a]n explanation of the consumer's right to affirmatively consent to" participating in the financial institution's overdraft service. § 1005.17(d)(1)-(4). If use of a model clause were, by itself, an impenetrable shield, a consumer would have no redress for a failure to include any of those specific items of content items in the notice – defeating the purpose of Regulation E as well as, more generally, the purpose of Congress in providing "individual consumer rights." 15 U.S.C. § 1693. To afford immunity, then, the model clause must be "appropriate" in the sense that it must provide a "clear and readily understandable" "description of the … overdraft service" of the particular financial institution that is using it. 12 C.F.R. §§ 1005.4, 1005.17(d); *see also Gunter*, 2017 WL 4274196 at *3 (adding more detailed explanation of credit union's overdraft service than that set forth in Model Form A-9 would not violate Regulation E because "Regulation E expressly requires financial institutions to describe their overdraft services" and "[p]resumably that description must be accurate and not misleading"); *Pinkston-Poling v. Advia Credit Union*, No. 15CV1208 (GJQ), 2017 WL 5153218 at *2 (W.D. Mich. Apr. 20, 2017) ("The regulation [§ 1005.17(d)] does not say that the notice must describe the overdraft service described in Model Form A-9; it says that the financial institution must describe *it's* [sic] *own* overdraft service") (emphasis in the original); *Smith v. Bank of Hawaii*, No. 16CV513 (JMS) (RLP), 2017 WL 3597522 at *8 (D. Haw. Apr. 13, 2017) ("Surely, BOH cannot argue that Model Form A-9's single sentence

15

describing overdrafts . . . is alone sufficient to accurately describe every financial institution's overdraft service. Model Form A-9 is a *model*, and Regulation E even contemplates that financial institutions would need to modify it when it explicitly permitted additional language to provide "a brief description of the financial institution's overdraft service." (internal quotation marks and citation omitted)); *see also* Official Staff Interpretations, 12 C.F.R. § 205 Supp. I App'x A §§ 3("The use of appropriate clauses in making disclosures will protect a financial institution fom liability …. provided the clauses accurately reflect the institution's EFT services…..Financial institutions may use clauses of their own design in conjunction with the Board's model clauses. The inapplicable words or portions of phrases in parentheses should be deleted. Financial institutions may make alterations, substitutions, or additions in the clauses to reflect the services offered ….").

While Liberty did use language from the Model Form A-9, Adams plausibly alleges that use of the form, by itself, was not "appropriate" because the language did not describe Liberty's overdraft program in a "clear and readily understandable" way.

### B. CUTPA

CUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). A CUTPA claim must allege that "(1) the defendant committed an unfair or deceptive act or practice; (2) the act complained of was performed in the conduct of trade or commerce; and (3) the prohibited act was the proximate cause of harm to the plaintiff." *Pellet v. Keller Williams Realty Corp.*, 172 A.3d 283, 298 (Conn. App. Ct. 2017). The courts use three factors to determine whether an act or practice is unfair: 1) whether it is in violation of public policy as established by common law or statute, 2) whether it

is otherwise immoral, and 3) whether it causes substantial harm to consumers. *Tillquist v. Ford Motor Credit Co.*, 714 F. Supp. 607, 616 (D. Conn. 1989) (citations omitted).

Liberty argues that Adams's CUTPA claim "is at bottom a mere breach-of-contract claim," which is insufficient to make out a violation of CUTPA, and further that it did not engage in any deceptive or unfair practice. As discussed above, however, Adams is not making a breach-of-contract claim; she is instead asserting a violation of a federal regulation. And such a violation can serve as the basis for a CUTPA claim, under the "public policy" prong. *See, e.g., Levinson v. PSCC Services, Inc.*, 2010 WL 5477250 *16 (denying motion to dismiss CUTPA claim against bank based on its violation of federal banking regulatons). Connecticut courts have not found, however, that an EFTA violation automatically gives rise to a CUTPA claim. Indeed, in one EFTA case involving a Regulation E claim similar to the one in this case, this Court dismissed the CUTPA claim. *Walker*, 305 F. Supp. 3d at 380-81. The CUTPA claim in *Walker*, however, appears to have relied on an alleged breach of contract in that case, *see id.* at 373 (describing CUTPA claim as allegation that bank "promised [the] [p]laintiff and the [c]lass members in its contracts and in other representations, including marketing materials, that it would only assess fees for overdrafts where the transaction at issue exceeded the amount of money in the customer's account."); and the Court dismissed the claim because it found no "aggravating circumstances" beyond a simple breach of contract. It does not appear that the CUTPA claim relied on the violation of Regulation E, and the Court did not mention Regulation E in its discussion of the CUTPA claim. *Id.* at 381 ("In this case, Walker claims that [the bank] assessed overdraft fees where the contract did not authorize the fees. Walker has not alleged any aggravating circumstances beyond breach of contract that would suffice to state a claim for unfair or deceptive practices."). *Walker* thus does not appear to have addressed whether the

Regulation E violation in that case might have stated a CUTPA claim under CUTPA's "public policy" prong.

It is also true that a statutory or regulatory violation does not violate CUTPA under the "public policy" prong when it is merely a "technical" violation. *Normand Josef*, 230 Conn. at 524-25, 646 A.2d 1289 (finding that bank's violation of statutory notice requirements was a "technical violation… [that] did not did not offend public policy, implicate the concept of unfairness or cause the type of substantial injury that CUTPA was designed to address."). As discussed previously, however (*see* note 3, *supra*), Adams has alleged a real injury associated with the alleged Regulation E violation. She has also alleged that Liberty knew or should have known that its opt-in notice was misleading to consumers, which is not a mere technical violation of Regulation E.

In any event, Adams has also plausibly alleged that the alleged Regulation E violation infringed CUTPA under the "deceptive" act prong, an independent basis for CUTPA liability. To show an act or practice is deceptive: "[f]irst, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material—that is, likely to affect consumer decisions or conduct." *Caldor, Inc. v. Heslin*, 577 A.2d 1009, 1013 (Conn. 1990). Adams has plausibly alleged that the opt-in notice was unclear and could cause reasonable consumers to misinterpret its language and be deceived as to the realities of Liberty's overdraft program. (ECF No. 1 at ¶¶ 91-94). Adams can satisfy the "deceptive" prong of CUTPA if the bank failed to disclose information it had a duty to disclose. *Normand Josef*, 230 Conn. at 1307. Here, Regulation E required Liberty to disclose its overdraft policy to consumers in a "clear and readily understandable" way and, as shown above,

18

Adams has alleged that Liberty failed to satisfy this requirement. This is sufficient to state a claim under the "deceptive prong" of CUTPA.

## IV.     CONCLUSION

Defendant's Motion to Dismiss for failure to state a claim is DENIED.


Dated:  August 23, 2021                                                          /s/
        Hartford, Connecticut                              Michael P. Shea, U.S.D.J.